UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel*. CATHY WILDHIRT and NANCY McARDLE, STATE OF ILLINOIS *ex rel*. CATHY WILDHIRT and NANCY McARDLE, and CATHY WILDHIRT and NANCY McARDLE, individually, | ) ) ) ) ) ) | |
| | ) | 09 C 1215 |
| Plaintiffs, | ) ) | Judge Feinerman |
| vs. | ) ) ) | |
| AARS FOREVER, INC., an Illinois corporation, and THH ACQUISITION LLC I, a Delaware limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

In this *qui tam* action brought on behalf of the United States and the State of Illinois, Plaintiffs-Relators Cathy Wildhirt and Nancy McArdle allege that their former employers, Defendants AARS Forever, Inc. ("AARS"), and THH Acquisition LLC I ("Acquisition") violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1 *et seq.* ("IWRPA"), by submitting false and fraudulent claims to the federal and state governments. Relators also bring individual claims alleging that Acquisition violated the FCA's and IWRPA's anti-retaliation provisions by terminating their employment in retaliation for calling attention to the false or fraudulent claims. After the United States and the State of Illinois declined to intervene, the complaint was unsealed and served on Defendants, who have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The motion is granted, but Relators are given leave to file an amended complaint that attempts to satisfy the applicable pleading standards.

**Background**

The facts alleged in the complaint are assumed true on a Rule 12(b)(6) motion. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005). In May 2007, Defendant AARS entered into a contract with the Veterans Administration ("VA") to provide home healthcare services and durable medical equipment to respiratory patients in portions of Illinois, Wisconsin, and Michigan. AARS also provided medical services to respiratory patients through the Medicaid and Medicare programs. Defendant Acquisition took over AARS's business under the VA, Medicaid, and Medicare programs in early 2008. Both AARS and Acquisition operated under the name "Total Home Health."

From 2007 until September 2008, Plaintiffs-Relators Wildhirt and McArdle worked as a respiratory therapists for AARS and then for Acquisition. During their employment, Relators came to realize that Defendants were breaching numerous performance requirements under the VA contract (Doc. 1, ¶¶ 86, 104-137) and violating numerous Medicare and Medicaid standards and regulatory provisions (*id*. ¶¶ 139-163). Those breaches and violations, Relators allege, caused all or nearly all of the claims sent by Defendants to the federal and state governments to be "false claims." *Id*. ¶¶ 138, 157, 164, 175-177, 188-189.

Relators repeatedly complained to their supervisors that Defendants were violating the VA contract, breaching applicable Medicaid and Medicare regulations, and placing patients at risk. *Id*. ¶¶ 165-169. McArdle's complaints culminated in a "run-in" with Richard Manning, a senior official at Acquisition, the Friday before Labor Day in 2008. *Id*. ¶ 169. McArdle left a message with Scott Hughes, her direct supervisor, stating that she would not return to work on Tuesday because she was distraught over her conversation with Manning and uncertain whether

she could continue to work under existing conditions. *Id*. ¶ 170. A human resources manager then contacted McArdle and told her that if she did not return to work on Tuesday, she would be terminated for job abandonment. *Ibid*. McArdle did not return on Tuesday, and was terminated later that week. *Ibid*.

Wildhirt was ill over that same Labor Day weekend and informed her direct supervisor, McArdle, who in turn informed Hughes. *Id*. ¶ 171. Although Acquisition knew that Wildhirt was ill and had a doctor's note restricting her from working, Wildhirt was terminated the same day as McArdle for job abandonment. *Ibid*. Relators contend that their terminations "were directly related to the fact that they were regularly trying to provide an adequate level of patient care on behalf of a company who seemed not to care at all about providing such care to veterans." *Id*. ¶ 173. The Illinois Department of Employment Security, in a decision entitled to judicial notice on a Rule 12(b)(6) motion, *see 4901 Corp. v. Town of Cicero*, 220 F.3d 522, 527 n.4 (7th Cir. 2000), ruled that Wildhirt was not "discharged"; rather, she "knew that she could have preserved her job by returning" a call from Acquisition's Human Relations Department two days after Labor Day, "but she decided not to do that." Doc. 29-1.

**Discussion**

The complaint contains four counts. Count I is a *qui tam* claim against both Defendants under the FCA, alleging that they knowingly submitted false or fraudulent claims to the United States. Count III is a materially identical *qui tam* claim against both Defendants under the IWRPA, alleging that Defendants knowingly submitted false or fraudulent claims to the State of Illinois. Counts II and IV allege that Acquisition unlawfully terminated Relators in violation of the anti-retaliation provisions of the FCA and IWRPA, respectively.

### A. Counts I and III: FCA and IWRPA *Qui Tam* Claims

*Qui tam* claims brought under the FCA are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). The same pleading standards apply to *qui tam* claims brought under the IWRPA. *See Mason v. Medline Indus., Inc.*, 2009 WL 1438096, at *2 (N.D. Ill. May 22, 2009) (citing *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999)). To support their *qui tam* claims, the Relators must allege "the who, what, when, where and how" of the alleged fraud. *Gross*, 415 F.3d at 605.

Relators' FCA claim alleges that Defendants "knowingly submitted, and/or continue to submit … false or fraudulent claims for payment" to the federal government, "knowingly made, used, or caused to be made or used … false records and statements to obtain payment" from the government, and "knowingly submitted, and possibly continue[] to submit … false or fraudulent claims for payment or approval by improperly retaining funds that should have been credited to" the government. Doc. 1, ¶¶ 175-177. These allegations mirror the bad acts set forth in 31 U.S.C. §§ 3729(a)(1), (2), and (7). Relators' IWRPA claim makes parallel allegations under parallel provisions of the IWRPA. *See* Doc. 1, ¶¶ 188-189; 740 ILCS 175/3(a)(1), (2).[*]

---

[*] The FCA was amended and re-codified effective May 20, 2009. *See* Pub.L. 111-21, 123 Stat. 1621. Because only the amendment to 31 U.S.C. § 3729(a)(2) (now § 3729(a)(1)(B)) is retroactive, because the parties do not contend that the amendment has any substantive impact on this case, and because Defendants' alleged misconduct preceded the amendments, the pre-amendment version of the statute will be cited. *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 n.* (7th Cir. 2009); *United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895 n.3 (N.D. Ill. 2009). The IWRPA was amended and re-codified effective July 27, 2010, and now is known as the Illinois False Claims Act. *See* Ill. Pub. Act 96-1304, § 10. Again, because the parties do not suggest that the amendment has any substantive impact on the case, the pre-amendment version of the statute will be cited.

A *qui tam* plaintiff must allege that the defendant actually submitted a claim for payment to the government, and that the claim was knowingly false. *See United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741-42 (7th Cir. 2007) (affirming dismissal of FCA claim because "Relators do not present any evidence *at an individualized transaction level* to demonstrate that Caremark" engaged in the alleged fraud), *overruled in part on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 909-10 (7th Cir. 2009); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 377 (7th Cir. 2003) (affirming dismissal of FCA claim because "the pleadings [do not allege] a single instance of a false statement made to obtain payment"); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1312 (11th Cir. 2002). That is, "[i]n order to plead cause of action for the submission of a false claim under the FCA and IWRPA, [a relator] must plead with particularly the details of *actual claims* submitted to the government." *United States ex rel. Grant v. Thorek Hosp.*, 2008 WL 1883454, *2 (N.D. Ill. Apr. 25, 2008). Complaints that merely allege breaches of contract, cost overruns, or regulatory violations do not suffice. *See Fowler*, 496 F.3d at 743; *Garst*, 328 F.3d at 378; Clausen, 290 F.3d at 1311. As the Seventh Circuit has instructed, "failing to keep one's promise is just breach of contract, and cost overruns in government procurement projects may occur without fraud. To satisfy Rule 9(b), [the plaintiff must] allege that [the defendant] said something knowing at the time that the representation was false (or not intending to perform); failures to satisfy the customer *ex post* are not fraud … ." *Garst*, 328 F.3d at 378.

Relators have failed to satisfy these pleading standards. The complaint's principal thrust is that because Defendants violated the VA contract and breached Medicare and Medicaid regulations in so many ways, their performance fell so short that every or nearly every claim they submitted to the federal and state governments was false and fraudulent. Doc. 1, ¶¶ 138,

157, 164, 175-177, 188-189. The Seventh Circuit has rejected this "gestalt" method of alleging a *qui tam* claim, explaining that however rotten a government contractor's performance or motives, the relator must "identify *specific* false claims for payment or *specific* false statements made in order to obtain payment." *Garst*, 328 F.3d at 376. Consistent with this principle, the Seventh Circuit held that a *qui tam* claim could not rest on allegations that "[a]ll Lockheed invoices and payments within the statute of limitations" were fraudulent due to its prior violation of ethical rules, or that "[t]he total claims" for a specific component of contract were "fraudulent or false" because Lockheed submitted a false cost estimate to obtain the contract. *Garst*, 328 F.3d at 377-78; *see also United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 857-58 (7th Cir. 2006). Relators' attempt to paint with an equally broad brush fails for the same reason. *See Clausen*, 290 F.3d at 1131 (a plaintiff cannot "merely … describe a private scheme in detail but then … allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government").

The complaint does get more focused at points, but not focused enough to state a *qui tam* claim. For example, Relators allege that Defendants impermissibly billed the VA for follow-up visits, knowingly failed to return overpayments to the VA, and intentionally overbilled for equipment. Doc. 1, ¶¶ 115, 129, 140-141, 163-164. But these allegations fail to identify *specific* improper billings, knowing failures to return overpayments, or intentional overbillings, and thus cannot support a *qui tam* claim. *See Fowler*, 496 F.3d at 741-42; *Garst*, 328 F.3d at 376. At other points, the complaint alleges that McArdle noticed that may Medicaid and Medicare invoices "*seemed* extremely exaggerated – vastly overpriced"; that McArdle alerted a fellow employee "about the *seemingly* outrageous prices charged on [certain] delivery invoices"; and

that Defendants maintained "what *appear* to be inflated billing records" and engaged in "*likely* massive overbilling." Doc. 1, ¶¶ 140, 144, 154, 161 (emphasis added). These allegations are all hedged—Relators for some reason are unable or unwilling to straightforwardly allege that Defendants actually overbilled Medicare and Medicaid—and thus are insufficient to allege a false or fraudulent claim. *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (allegation that "*certain* alloys of [Brush] *may have been* mismarked" insufficient to plead FCA claim); *Mason*, 2009 WL 1438096, at *4 (allegations that "one employee was hired '*perhaps* [] as a favor' to a provider, and a second was given substantial severance pay '*apparently* [] to mollify' another provider" are "too feeble to satisfy the requirements of Rule 9(b)" and "fail to plead fraud with particularity") (emphasis added).

In an effort to plead at the requisite level of specificity, Relators reference and attach two sets of exhibits to the complaint. The first set is a collection of credit card invoices reflecting VA payments to Defendants. Doc. 1-2 at 80-86 (referenced by Doc. 1, ¶ 137). The invoices, however, are not linked to any specific claim made by Defendants, let alone a specific claim alleged to be knowingly false. *See Garst*, 328 F.3d at 377; *Mason*, 2009 WL 1438096, at *4 ("But these entries standing alone demonstrate nothing. Mason has the burden to link specific acts of deceit to false claims."); *id*. at *7 (while relator "identifies a number of delivery orders made under the procurement contracts in 2008 and the dollar amounts of those orders," he "does not tie the fraud he witnessed during his employment to" those claims). The second set consists of "delivery tickets" that reflect deliveries of equipment to three particular Medicare or Medicaid patients. Doc. 1-2 at 87-101 (referenced by Doc. 1, ¶ 163). Like the invoices reflecting VA payments to Defendants, however, these tickets are neither claims submitted to the government for payment nor linked to any specific claim, and thus cannot support a *qui tam* claim.

In another attempt at specificity, Relators point to the "harrowing example" of "an infant patient covered by Medicaid *or* a private insurer [who] was placed in extreme jeopardy" when one of the Defendants (the complaint does not say which one) initially failed to properly set up a ventilator. Doc. 1, ¶ 162 (emphasis added). This allegation is insufficient because the complaint allows for the possibility that the infant was covered by a private insurer, not the government. *See Crews*, 460 F.3d at 857 (rejecting FCA claim where complaint did not foreclose possibility that private insurance company was billed). And even if the patient were covered by Medicaid, the complaint does not allege that the claim submitted to the government was false or improper in any way; indeed, the complaint acknowledges that the Defendant ultimately succeeded in "properly" setting up the ventilator. Doc. 1, ¶ 162.

The complaint also alleges that whenever a Defendant submits a bill to the government, "it certifies its compliance with all applicable regulations." Doc. 1, ¶ 146. The Seventh Circuit has instructed that "where an FCA claim is based upon an alleged false certification of regulatory compliance, the certification must be a condition of the government payment in order to be actionable." *Gross*, 415 F.3d at 605; *see also Crews*, 460 F.3d at 858; *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) ("a claim under the Act is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment") (citing cases). Although the complaint alleges that Defendants were required to certify that they *would* comply with applicable regulations as a condition of *enrolling* in the Medicare and Medicaid programs, the complaint does not allege that Defendants were required to accompany each *claim for payment* with a certification that they *had* complied with applicable regulations. Doc. 1, ¶¶ 146-147, 151-152. Absent such an allegation, Relators cannot premise their *qui tam* claims on Defendants' submission with each bill of allegedly false certifications of compliance. *See Gross*,

415 F.3d at 605 (affirming dismissal of FCA claim where relator "failed to allege that any particular certification of regulatory compliance was a *condition* of payment of government money"); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006) ("for a false statement or course of action to be actionable under the false certification theory of false claims liability, it is necessary that it involve an actual *claim,* which is to say, a call on the government fisc"); *United States ex rel. Kennedy v. Aventis Pharms., Inc.*, 610 F. Supp. 2d 938, 947 (N.D. Ill. 2009) (*Gross* "suggests that making a false certification involving a matter that is a condition of program eligibility, not a condition of payment of a claim, does not give rise to FCA liability"). This conclusion directly follows from the bedrock principle that a relator must allege that the defendant made a false or fraudulent claim "*at an individualized transaction level*." *Fowler*, 496 F.3d at 742.

Finally, Relators allege in a most conclusory fashion that Defendants "conspired to defraud" the United States and State of Illinois "by getting a false or fraudulent claim allowed or paid." Doc. 1, ¶¶ 178, 190. The FCA and IWRPA prohibit conspiracies to submit false or fraudulent claims. *See* 31 U.S.C. § 3729(a)(3); 740 ILCS 175/3(a)(3). But to state a conspiracy claim, a relator must allege that the defendants had an agreement or formed a combination to defraud the government and that the defendants did so for the purpose of obtaining payment from the government. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); *Walner*, 660 F. Supp. 2d at 895-96. The complaint does not allege that AARS and Acquisition agreed to defraud the state or federal governments. And in response to Defendants' submission that this allegation was not made (Doc. 29 at 12), Relators said nothing (Doc. 34), thus forfeiting the point. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 502 (7th Cir. 2005).

B.     Counts II and IV:  FCA and IWRPA Retaliation Claims

Relators also bring claims against Acquisition under the FCA's and IWRPA's anti-retaliation provisions, *see* 31 U.S.C. § 3730(h); 740 ILCS 175/4(g), alleging that they were terminated for engaging in protected conduct under the statutes.  Doc. 1, ¶¶ 182-186, 193-197.  To state a claim for retaliatory discharge, Relators must show: (1) their actions "were taken in furtherance of an FCA [or IWRPA] enforcement action"; (2) Acquisition "knew" that Relators "were engaged in this protected conduct"; and (3) "the discharge was motivated, at least in part, by the protected conduct."  *United States ex rel. Batty v. AmeriGroup Ill., Inc.*, 528 F. Supp. 2d 861, 877 (N.D. Ill. 2007); *see also Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *McDonough v. City of Chicago*, 743 F. Supp. 2d 961, 987-88 (N.D. Ill. 2010) (IWRPA claim).  Although a retaliation claim may proceed where the enforcement action post-dates an employee's termination, the filing of an action must be a "distinct possibility" prior to termination; simply informing an employer that certain actions were "illegal," "improper," or "fraudulent," without any explicit mention of the possibility that the employee would sue, does not suffice.  *Brandon*, 277 F.3d at 944; *see also Batty*, 528 F. Supp. 2d at 877; *United States ex rel. Kennedy v. Aventis Pharms., Inc.*, 512 F. Supp. 2d 1158, 1168-69 (N.D. Ill. 2007).

Even putting aside the fact that the Illinois unemployment compensation authorities found that Wildhirt was not discharged at all, the complaint does not make the requisite allegations.  Relators merely allege that they repeatedly complained to their superiors about the deficient services provided by Defendants.  The complaint does not allege that Relators, prior to the termination of their employment, were investigating facts as a prelude to this lawsuit; nor does it allege that Relators told Acquisition that they were planning a lawsuit, that Acquisition suspected by any other means that a lawsuit was in store, or that Acquisition terminated Relators

because they were investigating or planning a lawsuit. To the contrary, the complaint alleges that Relators' terminations "were directly related to the fact that they were regularly trying to provide an adequate level of patient care on behalf of a company [that] seemed not to care at all about providing such care to veterans." Doc. 1, ¶ 173. This allegation, if true, shows that Relators are admirable people who were treated poorly by their employer, but it fails to show that they were retaliated against in violation of the FCA or IWRPA. The retaliation claims accordingly are dismissed. *See Batty*, 528 F. Supp. 2d at 878 ("An employee's internal complaints directed at bringing the employer into compliance with its legal obligations do not put the employer on notice of potential FCA litigation.").

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted. Because it is not inconceivable that the pleading defects in both the *qui tam* and retaliation claims may be remedied, the dismissal is without prejudice, and Relators are allowed leave to file an amended complaint, as they requested in opposing dismissal. Doc. 34 at 4 n.1.

April 6, 2011

_____
United States District Judge