UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CATHY WILDHIRT AND NANCY MCARDLE, and STATE OF ILLINOIS *ex rel.* CATHY WILDHIRT AND NANCY MCARDLE,    ) ) ) ) ) ) Plaintiffs,   ) ) ) vs.   ) ) ) AARS FOREVER, INC., and THH ACQUISITION LLC I,   ) ) ) Defendants.   ) | 09 C 1215  Judge Feinerman |

<u>**Memorandum Opinion and Order**</u>

Plaintiffs-Relators Cathy Wildhirt and Nancy McArdle brought this *qui tam* action on

behalf of the United States and the State of Illinois, alleging that Defendants AARS Forever, Inc.

("AARS") and THH Acquisition LLC 1 ("Acquisition") violated the False Claims Act, 31

U.S.C. § 3729 *et seq.* ("FCA"), and the Illinois Whistleblower Reward and Protection Act, 740

ILCS 175/1 *et seq.* ("IWRPA").[*] The initial complaint also brought claims on behalf of Wildhirt

and McArdle individually, alleging retaliation in violation of both statutes. The court granted

---

[*] The FCA was amended and re-codified effective May 20, 2009. *See* Pub. L. 111-21, 123 Stat. 1621. Because the amendment to 31 U.S.C. § 3729(a)(2) (now § 3729(a)(1)(B)) is retroactive, because the parties do not contend that the amendment has any substantive impact on this case, and because Defendants' alleged misconduct preceded the amendments, the pre-amendment version of the statute will be cited. *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 n.* (7th Cir. 2009); *United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895 n.3 (N.D. Ill. 2009). The IWRPA was amended and re-codified effective July 27, 2010, and now is known as the Illinois False Claims Act. *See* Ill. Pub. Act 96-1304, § 10. Again, because the parties do not suggest that the amendment has any substantive impact on the case, the pre-amendment version of the statute will be cited.

Defendants' motions to dismiss the initial complaint without prejudice, 2011 WL 1303390 (Apr. 6, 2011), and allowed Relators leave to file an amended complaint, which they have done.  The amended complaint attempts to replead the *qui tam* claims but not the retaliation claims, which Wildhirt and McArdle confirm have been abandoned.  Doc. 57 at 2 n.2.  Defendants have moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6).  Their motions are denied.

"To establish civil liability under the [FCA], a relator generally must prove (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false."  *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011).  In briefing the initial motion to dismiss, the parties disputed whether the initial complaint identified "*specific* false claims for payment or *specific* false statements made in order to obtain payment."  *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003).  Alleging that the defendant made a "statement" in connection with a specific presentation to the government of a claim for payment is one way, perhaps the principal way, of pleading the first element of a *qui tam* claim.  *See, e.g., United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741-42 (7th Cir. 2007) (affirming dismissal of FCA claim because "Relators do not present any evidence *at an individualized transaction level* to demonstrate that" the defendant engaged in the alleged fraud), *overruled in part on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 920 (7th Cir. 2009); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1312 (11th Cir. 2002) ("[the relator's] failure to allege with any specificity if—or when—any actual improper claims were submitted to the Government is indeed fatal to his complaints under the particular circumstances of this case").

-2-

The parties did not discuss in connection with the first motion to dismiss an alternate means—one rooted in the fraud-in-the-inducement theory of fraud—of pleading the "statement" element of a *qui tam* claim. In *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009), the relator alleged that Rolls-Royce defrauded the United States regarding the quality of the T56 turboprop engine, which Rolls-Royce contracted to provide; that contracts between Rolls-Royce and the United States specified certain requirements for engine parts; and that Rolls-Royce knew that the parts were non-compliant. *Id.* at 853. Rolls-Royce argued, and the district court agreed, that the relator's complaint failed to state a claim because it did not identify "specific request[s] for payment." *Id.* at 854. In reversing, the Seventh Circuit held that the relator need not "produce the invoices (and the accompanying representations) at the outset of the suit" if she provides a plausible basis for believing that the defendant entered into a government contract with the intent not to perform or with the knowledge that it could not perform as promised. *Ibid*. The court explained: "Simple breach of contract is not fraud, but making a promise while planning not to keep it *is* fraud, and this complaint alleges the promise, the intent not to keep that promise, and the details of non-conformity. What else might be required to narrate, with particularity, the circumstances that violate [the FCA]?" *Ibid*. (internal citation omitted).

Other circuits have recognized that relators may plead an qui tam claim by plausibly alleging fraud-in-the-inducement. In *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), the relator alleged that the defendant "made false and fraudulent statements to the government in connection with claims for payment to a subcontractor hired by [the defendant] for a Department of Energy ('DOE') contract"—specifically, that before the contract was formed, the relator "misrepresented the cost and duration of the proposed subcontract in

order to get DOE approval for the subcontract, and that [the defendant] falsely certified that there was no conflict of interest with the subcontractor." *Id*. at 780. The district court dismissed the complaint under Rule 12(b)(6) "because the false statements and fraud 'were not made in connection with the presentation of a claim.'" *Id*. at 783. According to the Fourth Circuit: "The district court reasoned that the False Claims Act does not reach false statements in submissions to the Government to gain approval for subcontracting decisions. In the district court's view, the False Claims Act reaches only situations in which a 'claim [i.e., the demand for payment from the government] … is itself false or fraudulent.'" *Ibid*. (brackets in original); *see also id*. at 785 ("The district court would only find a false claim where a demand for payment is itself false or fraudulent (presumably for services not performed or for an incorrect amount). The district court flatly rejected the possibility that False Claims Act liability could rest on false statements submitted to the government to gain approval for a subcontract.").

The Fourth Circuit rejected the district court's view, holding that the FCA recognizes a fraud-in-the-inducement theory, under which liability attaches "for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." *Id*. at 787 (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543-44 (1943)). That is, even where "the claims [for payment] that were submitted were not in and of themselves false" and "the work contracted for was actually performed to specifications at the price agreed," FCA liability arises "because of the fraud surrounding the efforts to obtain the contract or benefit status." *Ibid*. Other circuits are in accord. *See United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009) ("Under a fraudulent inducement theory, although the Defendants' subsequent claims for payment made under the contract were not literally false, [because] they derived from

-4-

the original fraudulent misrepresentation [in the grant proposals], they, too, became actionable false claims.") (brackets in original; internal quotation marks omitted); *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) ("Although the focus of the FCA is on false 'claims,' courts have employed a 'fraud-in-the-inducement' theory to establish liability under the Act for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves."); *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1420-21 (9th Cir. 1991) (holding that "a contract based on false information is a species of false claim," and finding that an FCA claim was properly stated where the complaint alleged that the defendant "played an active part in having presented for signature a contract that the [defendant] knew was based on false information").

As noted in the court's initial opinion, the FCA's pleading standards apply to IWRPA claims. 2011 WL 1303390, at *2; *see also State ex rel. Beeler Schad & Diamond, P.C. v. Ritz Camera Ctrs., Inc.*, 878 N.E.2d 1152, 1157 (Ill. App. 2007); *People ex rel. Levenstein v. Salafsky*, 789 N.E.2d 844, 849 (Ill. App. 2003). Because a relator may plead an FCA claim under a fraud-in-the-inducement theory, the same holds under the IWRPA.

The amended complaint, whose well-pleaded allegations must be assumed true on a Rule 12(b)(6) motion, satisfactorily pleads a *qui tam* claim founded on a fraud-in-the-inducement theory. Relators alleges that AARS "solicited and secured the VISN 12 Contract under false pretenses, with no intention to provide appropriate care or fulfill its other contractual requirements to the United States," and that Acquisition "had full knowledge of [AARS]'s prior false claims" when it took over contract from AARS and "adopted and ratified the substandard care and numerous contractual violations" and "did not take corrective actions when Relators

-5-

brought these problems to its attention." Doc. 49 at ¶¶ 9, 11; *see also id.* at ¶ 71 "Relators soon discovered that [AARS] had intentionally lowballed its VISN 12 contractual bid and that, in fact, [AARS] had no intention of fulfilling the contract's requirements"; *id.* at ¶ 72 ("[AARS] entered into the VISN 12 Contract with the knowledge that it could not, and would not, be able to fulfill its contractual obligations, including most of the requirements set forth above without sustaining losses. [AARS], including its principals Alan Kirk, Manny Likou, Carolyn Likou, and Scott Hughes, never intended to fulfill the VISN 12 Contract requirements."); *id.* at ¶ 99 ("[AARS] entered into the VISN 12 Contract with no intention of appropriately training its staff or its drivers."); *id.* at ¶¶ 151, 154 (although Acquisition "was on notice of the fraudulent activity engaged in by [AARS] under the VISN 12 Contract," Acquisition "not only did not improve the patient care being provided under the VISN 12 Contract, … [but] ratified and continued th[at] fraudulent activity"). That is, the amended complaint alleges that Defendants had their fingers crossed at the very moment they entered into the contractual relationship with the government—that they "ma[de] a promise" to perform under the contract "while planning not to keep it." *Lusby*, 570 F.3d at 854.

If this were all that the amended complaint alleged, it might not have been sufficient to plead fraud-in-the-inducement. But the amended complaint does far more, alleging countless instances of blatant nonperformance, some directly on the heels of AARS and Acquisition entering into the contract, and thus raising a permissible inference that Defendants indeed entered into the contract while planning not to perform. *See Bettis*, 393 F.3d at 1330 ("fraudulent intent may sometimes be inferred" where "there is no intervening change of circumstances and where the repudiation comes quickly after the contract is signed"). The contract required Defendants "to provide respiratory therapy equipment, supplies and services"

to VA patients. Doc. 49 at ¶ 37. Specifically, Defendants were required, among other things, to provide "specially trained respiratory therapists," to conduct "frequent in-service education programs for those employees tasked with oxygen delivery and equipment setup," to perform "[i]nitial equipment setups, as well as follow-up inspections," and to retain "a sufficient number of respiratory therapists on call to handle patient emergencies." *Id.* at ¶¶ 40, 44, 46, 48. Further, Defendants were "not permitted to alter in any way a patient's RT-related prescriptions (the Plan of Care ...) without the prior written approval from" the Veterans Administration ("VA"). *Id.* at ¶ 53.

The amended complaint pleads numerous violations by AARS from the very beginning of the contractual relationship. Although AARS was required at the outset "to perform an initial visit by a licensed respiratory therapist, not a driver, of all 2,600+ patients," AARS did not make "many" of such visits and yet "bill[ed] for" them nonetheless. *Id.* at ¶ 77. Relators further allege that AARS "did not provide its respiratory therapists with the appropriate equipment," *id.* at ¶ 79, and hired inadequately trained therapists who provided contractually insufficient services, *id.* at ¶ 81, as exemplified by one instance in December 2007 in which basic health checks of a patient were not performed, *id.* at ¶ 83, and another in which a therapist did not know how to assess a ventilator and AARS responded by giving the therapist training by an unlicensed supervisor "who himself had little idea how to use the equipment he was ostensibly teaching others ... to use," *id.* at ¶ 107. The amended complaint charges that "[b]y commencing its VISN 12 Contract performance by using a medical record system filled with inaccurate information, [AARS] ensured that it would violate the terms of the VISN 12 Contract throughout its duration." *Id.* at ¶ 90. To buttress their claim that AARS "entered into the VISN 12 Contract with no intention of appropriately training its staff or its drivers," Relators allege that drivers

-7-

transferred to AARS from the prior contractor "were terminated and replaced with individuals with no knowledge of how to set up the specialized respiratory therapy equipment covered under the VISN 12 Contract," and yet that "no competencies or trainings were ever offered." *Id*. at ¶¶ 99, 100.  The amended complaint alleges that Wildhirt "regularly found" on her follow-up visits to patients that the wrong equipment was delivered and other equipment was improperly set up, *id*. at ¶ 102, and that Wildhirt was "criticized" by AARS "senior management" for "the amount of time she spent correctly setting up the home oxygen equipment initially set up by untrained drivers," *id*. at ¶ 120.  Similarly, despite the contract's requirement that the VA be notified when certain problems are discovered in a home visit, Wildhirt "was reprimanded for reporting the problems to the VA," *id*. at ¶¶ 112-13, and McArdle "was regularly instructed not to communicate with the VA about ongoing problems," *id*. at ¶ 145.  Moreover, despite a contractual requirement that only new equipment be provided to patients, an "upper level official[]" of AARS told McArdle that the company had adopted a policy of providing used machines to patients until it was shown that they had tolerated the therapy.  *Id*. at ¶¶ 32, 136.

Relators allege a similar pattern of violations by Acquisition.  The amended complaint charges that Acquisition failed to correct the prescription and Plan of Care errors in the database system when it assumed responsibility for the contract, *id*. at ¶ 174, and that there "were no competencies or trainings ever offered to THH-Acquisition employees," *id*. at ¶ 162.  Relators further allege that "inexperienced" drivers were instructed to set up respiratory therapy equipment, with the result being that "in numerous instances, either the wrong equipment was delivered ... or the equipment was set up improperly" and "patients were left to their own devices."  *Ibid*.  Wildhirt "regularly" found in her follow-up visits to patients that their equipment was deficient, and Acquisition performed no follow-up visits to ensure that beds and

lifts were correctly installed. *Id*. at ¶¶ 163-164. In 2008, one patient received a ventilator that was not set up by Acquisition, "contrary to the prescriptions written for this veteran." *Id*. at ¶ 175. And contrary to the contract's requirements, Acquisition discouraged McArdle from reporting these and other problems to the VA. *Id*. at ¶¶ 182-88.

The point of reciting these allegations of nonperformance is not to suggest that FCA liability can be grounded on mere breaches of contract. It cannot. *See Garst*, 328 F.3d at 378 ("failing to keep one's promise is just breach of contract, and cost overruns in government procurement projects may occur without fraud"). The point, rather, is to show that the amended complaint provides factual backup to support its allegation that Defendants entered into the contract with their fingers crossed, thereby committing fraudulent inducement. And because that theory of *qui tam* liability covers all of the claims for payment made under the contract at issue here, *see Harrison*, 176 F.3d at 787, there is no need to address Relators' alternative grounds for avoiding dismissal.

For these reasons, Defendants' motions to dismiss the amended complaint are denied. The parties are reminded that "[t]o say that fraud has been *pleaded* with particularity is not to say that it has been *proved*," and also that the amended complaint's allegations "may be wrong." *Lusby*, 570 F.3d at 855. And if the evidence proves Relators' allegations to be not merely wrong, but objectively baseless, Defendants may have remedies of their own. At this point, however, it need only be said that the amended complaint survives Rule 12(b)(6) and therefore that the case may proceed.

November 4, 2011

_____
United States District Judge