UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CATHY WILDHIRT AND NANCY MCARDLE, and STATE OF ILLINOIS *ex rel.* CATHY WILDHIRT AND NANCY MCARDLE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Relators/Counter-Defendants, | |
| vs. | |
| AARS FOREVER, INC., and THH ACQUISITION LLC I, | |
| Defendants/Counter-Plaintiffs. | |

09 C 1215

Judge Feinerman

### MEMORANDUM OPINION AND ORDER

Relators Cathy Wildhirt and Nancy McArdle brought this *qui tam* action on behalf of the United States and the State of Illinois, alleging that AARS Forever, Inc. ("AARS") and THH Acquisition LLC 1 ("Acquisition") violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1 *et seq.* ("IWRPA"). The court granted Defendants' motion to dismiss the original complaint and gave Relators a chance to replead. 2011 WL 1303390 (N.D. Ill. Apr. 6, 2011). Relators filed an amended complaint, Defendants moved to dismiss the amended complaint, and the court denied that motion. 2011 WL 5373985 (N.D. Ill. Nov. 4, 2011). Defendants answered the amended complaint and counterclaimed. Doc. 109 at pp. 68-80 (Acquisition's counterclaims); Doc. 110 at pp. 74-88 (AARS's counterclaims). Relators have moved to dismiss the counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 118. The motion is granted in part and denied in part.

**Background**

In considering Relators' motion to dismiss, the court assumes the truth of the counterclaims' factual allegations, though not their legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). The court also must consider "documents attached to the [counterclaims], documents that are critical to the [counterclaims] and referred to in [them], and information that is subject to proper judicial notice," along with additional facts set forth in Defendants' brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The following facts are set forth as favorably to Defendants as these materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012). Familiarity with the factual backdrop of this litigation, which is set forth in the courts' prior opinions, is assumed. 2011 WL 1303390, at *1-2; 2011 WL 5373985, at *3-4.

Relators were employed by Defendants from July 2007 through September 2008. Doc. 109 at ¶¶ 6-7; Doc. 110 at ¶¶ 6-7. (All citations to Docs. 109 and 110 are to Defendants' counterclaims, not to their answers.) During that time, Relators were bound by an Employee Confidentiality, Non-Compete, and HIPAA Agreement. Doc. 109 at ¶ 11; Doc. 110 at ¶ 9. McArdle signed the Agreement on July 11, 2007, and Wildhirt did so on April 6, 2008. Doc. 109 at ¶ 11; Doc. 110 at ¶ 9. The Agreement provides in relevant part:

> 4. I acknowledge that in my employment I am or will be making use of, acquiring or adding to Company's Confidential Information … . [I]n order to protect Company's Confidential Information and to protect other employees who depend on Company for regular employment, I agree as follows:
>
> > 1. I will not during or after the term of my employment in any way utilize any of said Confidential Information, except with permission and in connection with my employment by Company, and I will not copy, reproduce or take with me the original or any copies of said Confidential Information, and I

       will not disclose any of said Confidential Information to anyone. Furthermore, I will not disclose the content of any company related verbal communications to anyone.

2.    I shall indemnify and hold Company harmless from any loss, claim or damages, including without limitation all reasonable attorney's fees, costs and expenses, arising out of or relating to the unauthorized disclosure of Confidential Information or other proprietary information of the Company, the Company's customers or principals by the Employee, directly or indirectly or alone or in concert with others, which indemnification shall be in addition to, and not in lieu of, all other remedies the Company may have hereunder, under applicable laws or in equity.

5.    I agree to comply with the Company patient confidentiality policies regarding the Health Insurance Portability and Accountability Act (HIPAA). I have read the Company's Employee Education document and policy, and understand if I violate these policies I will hold the Company harmless and accept full responsibility.

6.    I agree that I cannot receive any monetary reimbursement for involvement or assistance in a Qui Tam or Whistleblower action against the Company. If I am awarded such directly or indirectly, I will immediately disclose it to the Company and turn it over to the Company immediately. Furthermore, I agree that I am in violation of this agreement if I release company information that reveals suspect practices or investigations or if I use knowledge of such information to harm the Company reputation or damage relationships with the Company's referral sources of anyone else. I agree that the company cannot be responsible for suspect practices that it would otherwise be unaware if not made specifically aware of them by staff. I agree to notify the Company in writing immediately if I suspect practices that may be of concern. I agree that if I file any suit against the company including with the EEOC and lose said suit, I will reimburse Company for all expenses incurred.

                     \*   \*   \*

10.   Termination of employment for any reason will not terminate or modify in any way the responsibilities to Company hereunder of Employee and his or her representatives or assigns. I understand that actions in violation of this agreement may result in immediate dismissal and possible legal action. If I file a lawsuit or any other action or EEOC filing against the Company and lose that action, I

>       agree to reimburse Company including but not limited to monetary
>       damages, pain and suffering, attorney's fees, and other litigation
>       costs and expenses.

Doc. 109-4 at 2-3.

On January 25, 2008, McArdle signed an acknowledgment form regarding her HIPAA responsibilities. Doc. 109 at ¶ 16; Doc. 110 at ¶ 14. The form states:

>       In summary, I understand the rights and responsibilities of Total Home
>       Health, Inc. Protected Health Information Confidentiality Policy that I, as
>       an employee of Total Home Health, Inc., must comply with and implement.
>       Further, I understand that if I violate any of the policy terms, I may be
>       subject to disciplinary action, including discharge, loss of privileges,
>       termination of contract, legal action for monetary damages or injunction, or
>       both, or any other remedy available to Total Home Health, Inc.

Doc. 109-6 at 2. In addition, Relators signed "Confidential Acknowledgment of No Known Suspect Practices" statements. Doc. 109 at ¶ 18; Doc. 110 at ¶ 16. Each statement provides:

>       I sign this statement attesting to the fact that I am unaware of any suspect
>       business practices conducted by Total Home Health, Inc., and its staff other
>       than any issue I may have turned in a "Notification of Suspect Practices"
>       form for. If I am aware of any type of suspect practice, the Company has
>       informed me that I must complete the available "Notification of Suspect
>       Practices" form. I agree that the company cannot be responsible for suspect
>       business practices that it would otherwise be unaware of if not made
>       specifically aware of them by staff.

Docs. 109-7, 109-8. Relators did not report any alleged suspect practices to AARS or Acquisition management before filing this action. Doc. 109 at ¶ 24; Doc. 110 at ¶ 25.

Unbeknownst to Defendants and against their policies and procedures, McArdle took home and retained Defendants' confidential and HIPAA-covered documents during her period of employment. Doc. 109 at ¶ 20; Doc. 110 at ¶ 19. McArdle admitted that she haphazardly and for no particular purpose brought home documents containing HIPAA information, and then failed to return those documents after leaving her job. Doc. 119 at 6. McArdle had no intention

-4-

of filing a *qui tam* suit when she took these documents, *ibid.*, and she acknowledged that she should have returned the documents to Defendants when her employment terminated, Doc. 109 at ¶ 21; Doc. 110 at ¶ 20. McArdle disclosed those documents to her counsel, the government, and the public. Doc. 110 at ¶ 35.

Relators also disclosed to third parties the contents of company-related verbal communications. Doc. 109 at ¶ 23; Doc. 110 at ¶¶ 22, 34, 41. After her employment concluded, McArdle made disparaging remarks to the Veterans Administration ("VA") about Acquisition and its business practices. Doc. 109 at ¶ 28; Doc. 110 at ¶ 27. McArdle called the VA to say that she resigned from Acquisition because of the "remarks that were made to [her] about patient care," and she told John Orsenage of the VA that she "was really sorry that [she] had to leave but [she] could not work there any longer under those circumstances, and [she] said, 'Just watch close, John, what's going on. Competencies aren't being done like they are supposed to be.'" Doc. 109-3 at 18. Defendants allege that this statement was false, and that McArdle made further false statements to the VA, the State of Illinois, and private payors about Defendants' compliance with the VISN 12 Agreement and their other agreements with the VA. Doc. 109 at ¶ 59; Doc. 110 at ¶ 58; Doc. 119 at 18. McArdle has admitted that she brought this suit because Acquisition threatened to sue her for having disparaged it. Doc. 119 at 5. For her part, Wildhirt falsely told the VA that Defendants provided care that did not meet the contract terms, gave patients the wrong equipment, did not provide patients with the education to which they were entitled or with necessary supplies. Doc. 109-9 at 6-7; Doc. 119 at 18. Wildhirt made similarly false statements to private payors and the State. Doc. 109-9 at 8; Doc. 119 at 8.

Relators made the aforementioned statements even though they worked for Defendants for only a short time and had no knowledge of Defendants' general billing practices or the

specific requirements of the VISN 12 Agreement. Doc. 109 at ¶ 30; Doc. 110 at ¶ 29. For McArdle, *see* Doc. 109-3 at 9 ("Q. During the time you worked for Total Home Health, regardless of the ownership, what role did you have in billing the VA? A. None."), at 10 (admitting to never having seen the contract between AARS and the VA), at 11-13 (admitting to being unaware of any performance standards in the VISN 12 Agreement and to disregarding any such performance standards in favor of her own view that 100% performance was required at all times), at 27-29 (describing her role in billing, stating that "I wasn't responsible for anything," and that she could not describe the VA auditing process of billing documents). For Wildhirt, *see* Doc. 109-9 at 5 (admitting to only knowing the clinical aspects of the VA contract), at 11-12 (denying having seen any documents indicating what was necessary for Acquisition to carry out the VISN Agreement), at 13-15 (admitting to not having ever seen the VISN 12 Agreement: "I haven't read the contract"), at 16 ("I did not do billing. Q. Not only did you not do billing, you never saw any billing documents, correct? A. Correct. I was in the clinical field."), at 17-18 ("Q … [Y]ou have never seen any billing documents that went to or from the VA? A. Right. I did not do billing."), at 19-20 (admitting to having no knowledge of Acquisition's custom or practices regarding billing, stating "I wasn't involved in billing"). Prior to and in filing and prosecuting this suit, Relators made these false statements and released confidential information to harm Defendants and to interfere with Defendants' relationships with third parties, including the VA, the State of Illinois, and private payors. Doc. 109 at ¶¶ 29, 58; Doc. 110 at ¶¶ 28, 58.

## Discussion

AARS and Acquisition each filed six counterclaims, all under Illinois law. AARS's counterclaims are materially identical to Acquisition's. Counts I and II allege that Relators breached the Agreement through the unauthorized disclosure of confidential information outside

the company; Count III seeks indemnification under the Agreement for damages suffered as a result of those disclosures; Count IV alleges that Relators breached the Agreement by failing to report suspect practices to Defendants before filing this lawsuit; Count V claims that Relators committed tortious interference with prospective economic advantage by making false statements to third parties about Defendants' practices; and Count VI seeks reimbursement under the Agreement for legal costs and expenses should Defendants prevail in this lawsuit. Relators make three arguments to support dismissing the counterclaims, which are addressed in turn.

I.     **Public Policy Defense to Counts I-IV and VI**

Relators argue that Counts I-IV and VI should be dismissed because the provisions of the Agreement they are alleged to have violated are contrary to public policy and thus unenforceable. In support, Relators cite *Town of Newton v. Rumery,* 480 U.S. 386, 392 (1987), for the proposition that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." Doc. 118 at 4. Relators submit that the policy interest at stake as "the detection and exposure of potential fraud against the United States," and argue that "private agreements that would thwart that interest are not enforceable for reasons of public policy." *Id*. at 5. According to Relators, the Agreement thwarts that interest by chilling would-be *qui tam* relators from coming forward with evidence of fraud, thereby hindering government investigations. *Id*. at 5-6.

There is a well-developed jurisprudence that addresses these policy interests in the context of counterclaims brought against relators in FCA litigation. The law was ably summarized by Judge Lambreth in *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 505 F. Supp. 2d 20 (D.D.C. 2007). As an initial matter, "[t]he unavailability of contribution and indemnification for a defendant under the False Claims Act now seems beyond peradventure."

*Id*. at 26 (citing cases); *see also United States v. Omnicare, Inc.*, 2013 WL 381967, at *19 (N.D. Ill. July 23, 2013) ("a claim by an FCA defendant which requires for its success a finding that the FCA defendant is liable is barred by the FCA") (quoting *Harbert*, 505 F. Supp. 2d at 28) (alterations omitted). Thus, "an FCA defendant found liable of FCA violations may not pursue a counterclaim that will have the equivalent effect of contribution or indemnification." *Miller*, 505 F. Supp. 2d at 26; *see also Mortgages, Inc. v. U.S. Dist. Ct. for the Dist. of Nev.*, 934 F.2d 209, 212-13 (9th Cir. 1991). However, "a qui tam defendant may maintain a claim for independent damages; that is, a claim that is not dependent on a finding that the qui tam defendant is liable." *Miller*, 505 F. Supp. 2d at 26; *see also Cell Therapeutics, Inc. v. Lash Grp., Inc.*, 586 F.3d 1204, 1209 (9th Cir. 2009). Such independent claims fall in two categories. "The first … is where the conduct at issue is distinct from the conduct underlying the FCA case. This can be so even where there is a close nexus between the facts, so long as there is a clear distinction between the facts supporting liability against relator and the facts supporting liability against the FCA defendant. … These causes of action are truly independent of the FCA claims because none of them require as an essential element that the FCA defendant was liable—or not liable—in the FCA case." *Miller*, 505 F. Supp. 2d at 27 (citing cases); *see also Cell Therapeutics*, 586 F.3d at 1209. "The second category … is where the defendant's claim, though bound up in the facts of the FCA case, can only prevail if the defendant is found not liable in the FCA case. … These claims have surfaced in the form of libel, defamation, malicious prosecution, and abuse of process—claims that succeed upon a finding that the relator's accusations were untrue." *Miller*, 505 F. Supp. 2d at 27-28 (emphasis omitted). Because Defendants have pleaded facts that place their counterclaims comfortably in at least one of the two categories, the counterclaims cannot be dismissed on the pleadings as contrary to public policy.

Count I alleges that McArdle violated the Agreement by taking home, retaining, and disclosing confidential and HIPAA-protected documents—documents that she had no intention of using in this *qui tam* suit until after Acquisition threatened to sue her for breaching the Agreement. Doc. 109 at ¶¶ 35-36; Doc. 110 at ¶¶ 34-35; Doc. 119 at 11. Count II alleges that Wildhirt breached the Agreement by disclosing to others the content of confidential and HIPAA-protected information. Doc. 109 at ¶ 42; Doc. 109-9 at 6-9; Doc. 110 at ¶ 41. Drawing a reasonable inference in Defendants' favor, the court will assume at the Rule 12(b)(6) stage that Relators' retentions and disclosures went beyond the scope of those necessary to pursue their *qui tam* suit. As for damages, Defendants allege that they have incurred "costs and expenses in defending against this lawsuit, and in ensuring that their Confidential Information and HIPAA-protected information is not further improperly disclosed." Doc. 109 at ¶¶ 37, 43; Doc. 110 at ¶¶ 36, 42.

These counterclaims are independent of the FCA claim because, particularly given the extremely broad scope of documents and communications that Relators are alleged to have retained and disclosed, the counterclaims' success does not require as an essential element that Defendants are liable (or not liable) under the FCA. *See United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011) (holding that the public policy doctrine "would not cover [the relator's] conduct given her vast and indiscriminate appropriation of [the defendant's] files," given that the relator could not explain "why removal of the documents was reasonably necessary to pursue an FCA claim"). The counterclaims' allegation that Defendants were damaged due to having to incur "costs and expenses in defending against" the *qui tam* lawsuit is problematic to the extent it could be read to seek indemnification or contribution in the event Defendants are found liable under the FCA. Defendants admit that

"they cannot prevail on the counterclaims if Relators ultimately prevail" on their *qui tam* suit, so Counts I and II are dismissed to the extent they seek such indemnification or contribution.

Count III seeks indemnification from Relators under the Agreement for losses incurred by Defendants as a result of Relators' alleged breaches. Doc. 109 at ¶¶ 47-49; Doc. 110 at ¶¶ 46-48. Count VI seeks reimbursement from Relators under the Agreement in the event Defendants prevail on the *qui tam* claims. Doc. 109 at ¶¶ 63-64; Doc. 110 at ¶¶ 62-63. The Agreement's indemnification provision states in relevant part that Relators will "indemnify and hold [Defendants] harmless from any loss, claim or damages, including without limitation all reasonable attorney's fees, costs and expenses, arising out of or relating to the unauthorized disclosure of Confidential Information or other proprietary information of the Company, the Company's customers or principals by the Employee." Doc. 109-4 at 2-3. As with Counts I and II, Count III is dismissed to the extent it could be read to seek indemnification or contribution in the event Defendants are found liable. But Count III may proceed to the extent that Defendants seek damages not directly connected with this litigation. And Counts III and VI may proceed with respect to Defendants' attorney fees and legal expenses in the event they prevail on the merits, particularly if Defendants proceed to maintain that Relators' claims were frivolously pursued given their alleged lack of relevant knowledge of the relevant VA contracts and Defendants' performance thereunder. *See* 31 U.S.C. § 3730(d)(4) ("If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment."); *Mikes v. Straus*, 274 F.3d 687, 705 (2d Cir. 2001). The court is not suggesting that any such counterclaim would

be meritorious; that will depend on the outcome of the *qui tam* suit and, if Defendants prevail, on the grounds Relators had for bringing their claims.

Count IV alleges that Relators breached the Agreement and "Confidential Acknowledgment of No Known Suspect Practices" statements "by representing that they were not aware of any suspect practices by [Defendants], failing to report any suspect practices to … management, and then filing this lawsuit claiming facts to the contrary even though neither ever informed [Defendants] of these alleged suspect practices." Doc. 109 at ¶ 54; Doc. 110 at ¶ 53. As a result of these breaches, the counterclaim alleges, Defendants were deprived of the opportunity to "properly investigate and remedy any alleged issues," resulting in damages. Doc. 109 at ¶ 55; Doc. 110 at ¶ 54. As with Counts I-III and VI, if Defendants are found liable, Count IV must be dismissed. However, if Defendants prevail on the *qui tam* claims and can show a causal relationship between Relators' failure to report and their filing of the *qui tam* action, Count IV may proceed for the same reason that Counts III and VI may proceed. *See United States ex rel. Stephens v. Prabhu*, 1994 WL 761237, at *1 (D. Nev. Dec. 14, 1994) ("[Defendants] bring counterclaims for libel, trade libel, abuse of process, malicious prosecution[, and] … emotional distress. [Defendants] concede that these counterclaims arise from the Relators 'allegations of submission of false Medicare reimbursement claims.' If those allegations are proved true, [Defendants] … counterclaims can be dismissed on the ground that they will have the effect of providing for indemnification or contribution. Conversely, if [Defendants] are found not liable, their right to pursue these counterclaims must be preserved.") (internal quotation marks omitted).

## II. Pleading Challenge to Count V

Count V, which sounds in tortious interference with prospective economic advantage, alleges that Relators intentionally interfered with Defendants' relationship with the VA, the State of Illinois, and private payors by making false statements about Defendants' performance of their contractual duties. Doc. 109 at ¶¶ 56-60; Doc. 110 at ¶¶ 55-59. To state a claim under Illinois law for tortious interference with prospective economic advantage, a plaintiff must allege "(1) [a] reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Botvinick v. Rush Univ. Med. Ctr.,* 574 F.3d 414, 417 (7th Cir. 2009).

Relators focus on the third element, arguing that "Defendants fail to identify any false statements allegedly made by the Relators and also fail to identify any person or entity to whom the Relators allegedly made false statements." Doc. 118 at 15. That argument is incorrect. Defendants have alleged the nature of Relators' misrepresentations, to whom they were made, and the basis for alleging they were false. Doc. 109 at ¶ 59 (alleging that Relators "ma[de] false statements about [Defendants'] compliance with the April 2008 VISN Agreement and [their] subsequent agreements with the VA and about [Defendants'] handling of Illinois Medicaid business"); Doc. 110 at ¶ 58 (same); Doc. 109-3 at 17-18 (McArdle deposition testimony regarding the time and content of her statements); Doc. 109-6 at 6-10 (Wildhirt deposition testimony regarding the time and content of her statements). These allegations suffice to plead the third element of the tortious interference claim. *See Delloma v. Consolidation Coal Co.*, 996

F.2d 168, 172 (7th Cir. 1993) ("Frequently, [tortious interference] cases depend on statements alleged to be false or defamatory.") (collecting cases).

### III. Absolute Privilege Defense to Counts I-III and V

Finally, Relators contend that Counts I-III and V of the counterclaims are barred by absolute privilege under Illinois law for statements related to, made preliminary to, or made in the course of judicial proceedings. Doc. 118 at 13-14. "Illinois like other states recognizes an absolute privilege for statements in testimony or pleadings in a judicial proceeding." *MacGregor v. Rutberg*, 478 F.3d 790, 791 (7th Cir. 2007). The privilege applies to "communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding if the matter has some relation to the proceeding." *Kurtz v. Hubbard*, 973 N.E.2d 924, 928 (Ill. App. 2012) (internal quotation marks and alterations omitted). "[F]or a statement to qualify as a made in communications preliminary to a proposed judicial proceeding, the proposed proceeding must be contemplated in good faith and under serious consideration." *Medow v. Flavin*, 782 N.E.2d 733, 743 (Ill. App. 2002); *see also Horowitz v. Animal Emergency & Treatment Ctrs. of Chi., LLC*, 2012 WL 3598807, at *4 (N.D. Ill. Aug. 20, 2012) (same).

Significant here, the privilege is an affirmative defense, *see Kurtz*, 973 N.E.2d at 928, and thus need not be anticipated in a complaint or counterclaim. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) ("Judges should respect the norm that complaints need not anticipate or meet potential affirmative defenses."). At this stage of the case, and for the reasons stated in Section I, *supra*, it is impossible to say at this point whether Relators' *qui tam* suit was "contemplated in good faith and under serious consideration." *Medow*, 782 N.E.2d at 743. Accordingly, dismissal under Rule 12(b)(6) on absolute privilege grounds would be

inappropriate. *See Horowitz*, 2012 WL 3598807, at *5 ("because plaintiffs are not required to plead facts that anticipate and defeat affirmative defenses, the Court denies Defendants' motion to dismiss based on the absolute litigation privilege"); *cf. Villagrana v. Vill. of Oswego*, 2005 WL 2322808, at *5 (N.D. Ill. Sept. 22, 2005) (denying motion to dismiss based on absolute immunity because "[t]he degree to which the alleged defamatory statements were made within the scope of the Officers' official duties cannot be sufficiently assessed from the face of the Complaint").

## Conclusion

For the foregoing reasons, Relators' motion to dismiss Defendants' counterclaims is granted in part and denied in part. The counterclaims are dismissed with prejudice to the extent, if any, they seek recovery from Relators in the event Relators prevail over Defendants on the *qui tam* claims. Relators shall answer the counterclaims by October 4, 2013.

September 19, 2013

_____
United States District Judge